Filed 3/25/24  Marriage of Mansour CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re the Marriage of LUZELBA LOZANO and ZAKI SALEH MANSOUR. | B319787 |
| | (Los Angeles County Super. Ct. No. BD654378) |
| LUZELBA LOZANO MANSOUR, | |
| Respondent, | |
| v. | |
| ZAKI SALEH MANSOUR, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alison Mackenzie, Judge.  Affirmed.

Benedon & Serlin, Kelly Riordan Horwitz and Kian Tamaddoni for Appellant.

Decarolis Family Law Group, Patrick Decarolis, Jr., and Melissa Ramirez Fresquez for Respondent.

_____

In 2019, Zaki Saleh Mansour (Zaki) and Luzelba Lozano Mansour (Luci)[1] settled their dissolution of marriage action, agreeing on how to divide numerous real properties and obligations associated with those properties. Among the properties awarded to Zaki was an apartment building on Virginia Avenue in Los Angeles (the Virginia property). The Virginia property and the encumbrances and obligations associated with it were in Luci's name because of Zaki's credit issues. The marital settlement agreement (MSA) awarded Zaki the Virginia property "subject to the encumbrances thereon." The MSA further provided that various outstanding operational obligations for the Virginia property (such as amounts due for rent control fees, maintenance, and utilities) were "transferred to Zaki's name immediately." To make sure these operational obligations then in Luci's name were paid given the Virginia property's transfer to Zaki, the MSA directed payment for them would be made out of escrow from the sale of another property (the Sunset property).

In October 2020, Zaki requested the court order that both the mortgage loan encumbering the Virginia property and a specific amount ($300,000) for the apartment building's operational obligations be paid by the community (50 percent by Zaki, and 50 percent by Luci) instead of by him alone. The trial court denied these requests. It found the MSA's plain language awarding Zaki the Virginia property "subject to the encumbrances thereon" made him solely responsible for the

---

[1] As is common in family law matters, we refer to the parties by their first names for ease of reference and not out of any disrespect.

mortgage. The court further found the MSA made Zaki solely responsible for the outstanding operational obligations on the Virginia property upon its award to him.

Zaki now appeals, claiming the court erred in rejecting his interpretation of the MSA and finding that he alone was responsible for the mortgage loan on the Virginia property and its other obligations. We find no error and affirm.

## FACTUAL AND PROCEDRAL BACKGROUND

### A. The Parties' Dissolution of Marriage and MSA

On February 22, 2017, Luci filed for dissolution of her marriage to Zaki. On April 17, 2019, the parties participated in a mandatory settlement conference before Judge B. Scott Silverman at which Patrick DeCarolis represented Luci and Zaki represented himself. The parties reached a resolution and entered into the MSA, which was memorialized in a three-page document entitled "deal memorandum." (Capitalization omitted.)

As relevant here, the MSA addressed four real properties: the Virginia property, the Sunset property, a property on Mariposa Avenue in Los Angeles (the Mariposa property), and a property in Las Vegas. Zaki was awarded the Virginia and Las Vegas properties, Luci the Mariposa property, and the Sunset property was to be sold. Paragraph 1A of the MSA states, "The [Virginia property] is awarded to Zaki subject to the encumbrances thereon. Directly from the sales escrow on Sunset, below, the Los AngelesCity [*sic*] rent control fees and penalties on this property shall be paid as well as all other outstanding obligations on the building in Luci's name such as the elevator, pest control, maintnenance [*sic*], utiltities [*sic*], etc. All such obligations shall be transferred to Zaki's name immediately upon Luci's transfer to him. Zaki shall be responsible for all tax

3

liability upon sale or otherwise relating to this property." Paragraph 1B awarded the Mariposa property to Luci "subject to the encumbrances thereon," and paragraph 3 awarded the Las Vegas property to Zaki "subject to the encumbrances thereon."

Paragraph 2 of the MSA provided for the Sunset property (where Zaki was living) to be sold and for Zaki to vacate the property "upon the acceptance of an offer." "The net proceeds of the sale" were to be distributed to reimburse each party for costs and expenses related to the sale of the Sunset property, provide trusts for the couple's two children, and to pay costs related to two judgments against the community. The remaining amount was then "awarded one-half to each party." Paragraph 2 does not reference payment of the operational obligations on the Virginia property, or state whether those obligations are to be paid from one or both parties' sale proceeds.

Before signing the stipulated settlement, Judge Silverman repeatedly asked Zaki under oath whether he understood the terms of the MSA and agreed to them. Zaki responded that he understood the agreement and that "[a]s a matter of fact, I did participate in the drafting of the document." The court entered the MSA as a stipulated order enforceable pursuant to Code of Civil Procedure section 664.6, and per the parties' request, the settlement provisions became effective immediately as court orders. The court ordered DeCarolis to prepare a judgment.

Zaki was hospitalized between April 19 and July 12, 2019. However, he continued to communicate with Luci and DeCarolis by email. On April 23, April 30, and May 3, 2019, Zaki indicated he was unhappy with the settlement via emails to Luci and Decarolis, in which he claimed that, among other things, the settlement was fraudulent.

4

On May 7, 2019, Luci's counsel sent Zaki a copy of the proposed judgment. After some back and forth, it became clear the parties could not agree on language to be included in the proposed judgment. Accordingly, on August 29, 2019, the trial court (Judge Alison Mackenzie) entered a judgment of dissolution that attached an executed copy of the MSA without further elaboration.

## B. Zaki's Request for Order and Luci's Request for Order of Dismissal

The disputes between the parties over the MSA's terms nevertheless continued. On October 22, 2020, Zaki filed a request for order (RFO) seeking declaratory relief and enforcement of the terms of the MSA. His RFO made multiple requests for relief, of which only the first two are relevant to this appeal. In request No. 1, Zaki sought "[a]n order enforcing the [MSA] to have the sum of $2,145,704[] (which represents the balance due to Chase Bank [(Chase)] for the loan . . . encumbering the Virginia [property]) to be paid from the sale of Sunset [p]roperty []as an '[o]bligation in [Luci]'s name' that was incurred during the marriage, consistent with the [MSA] . . . which states . . . 'from the sales escrow on Sunset, below[,] the Los Angeles rent control fees and penalties on this property shall be paid as well as all other outstanding obligations on the building in Luci's name.' "

Request No. 2 was for "[a]n order requiring the sums due to elevator, pest control, maintenance, [and] utilities. This amount according to proof is approximately $300,000.00 (also included as an obligation to be paid in the [MSA] . . . . Note the language, 'from the sales escrow on Sunset, below[,] the Los Angeles rent control fees and penalties on this property shall be paid as well as

5

all other outstanding obligations on the building in Luci's name.' "

On November 20, 2020, Luci filed a response to Zaki's RFO. She explained Zaki refused to assume the loan for the Virginia property and that the Sunset property still needed to be sold to pay off debts. During the year that followed, the parties filed several RFOs relating to disputes over the sale of the Sunset property. In one such RFO filed on June 14, 2021, Luci stated that she had received a notice of acceleration from Chase, which asserted she was in default because she had transferred title of the Virginia property to Zaki. Luci requested permission to buy out Zaki's interest in the Sunset property, pay off the Chase loan, and then receive reimbursement from Zaki for the payoff amount.

On August 30, 2021, Luci filed an RFO to dismiss Zaki's October 22, 2020 RFO, which was set for an evidentiary hearing on September 22 through 24, 2021. She argued res judicata barred Zaki's RFO, including requests Nos. 1 and 2, because the judgment already addressed the relief he sought in awarding the property to him subject to all encumbrances.[2]

Zaki responded his requests were to enforce the judgment, not to relitigate it, and therefore res judicata did not bar them. He argued that "under the clear language of the [d]eal [m]emorandum, the Chase loan is to be paid from the proceeds of the sale on the Sunset property." Zaki claimed that "although [he] took the Virginia property subject to all encumbrances, this did not include outstanding obligations in Lu[ci]'s name, which

---

[2] Luci also requested that the court strike pages 11 through 14 of Zaki's declaration because they violated the 10-page limit of California Rules of Court, rule 5.118. The court did so.

6

were to be paid directly from the Sunset [property] sale proceeds." In support of his arguments, Zaki submitted excerpts from Luci's March 11, 2021 deposition, DeCarolis's April 30, 2021 deposition, and Zaki's April 21, 2021 deposition.

During her deposition, Luci testified that the parties agreed that "whatever loan that [was] on the property that [she] ke[pt], [she was] responsible for. Whatever loan that [was] on the property [Zaki] ke[pt], he[ was] responsible for." As to the Sunset property, "whatever liens or encumbrances were on that, those were going to be split 50/50." She further testified that the Chase loan was not assumable, and Zaki would have had to refinance it. She believed that he would not take the initiative to refinance it, and she needed to protect herself. "Therefore, it was [her] wish that, once Sunset sold, that, from his share of the proceeds—not from the entire proceeds of the sale but from his share, that the loan would be cleared to get [her] name off." She told Zaki this during the mandatory settlement conference and Zaki did not disagree "that the Chase Bank loan would be paid from his share of the sale on Sunset." She further testified that "all other outstanding obligations on the building in [her] name" referred to revolving expenses required to maintain the building.

DeCarolis testified that he was the typist and, with Zaki, co-author of the MSA with input from Luci. Obligations on the Virginia property had been placed in Luci's name because Zaki did not have credit. During the drafting of the MSA, Luci was concerned that such obligations would not be paid. Therefore, a sentence was inserted into paragraph 1A to convey that "vendors and taxes and so forth that were in Luci's name would be paid from the Sunset sale." DeCarolis acknowledged the loan on the Virginia property was an outstanding obligation on the building

7

in Luci's name, but that the MSA was written such "that the encumbrance related to Virginia . . . was separate." He acknowledged that the second sentence of paragraph 1A was an "exception" to the first sentence and that the MSA did not include express language that Zaki "assume[]" the Chase loan. DeCarolis further testified that the first time he learned of Zaki's claim that the Chase loan should be paid from the Sunset property sale proceeds was through Zaki's counsel on February 19, 2020.

Zaki testified that during the mandatory settlement conference, he and DeCarolis discussed that Luci would be liable for all obligations in her name, including the Chase loan, and that the Chase loan would be paid out of Luci's share of the Sunset property sale proceeds. Zaki assumed that his and DeCarolis's discussion would be reflected in the MSA. Zaki said he first discovered the Chase loan would not be paid from Luci's portion of the Sunset property sale proceeds on February 19, 2020, when DeCarolis responded to Zaki's counsel's correspondence by saying that paying the Chase loan from the sale proceeds was not the parties' agreement.

## C. The Hearing on Zaki's RFO and Luci's RFO for Dismissal

### 1. *RFO for Dismissal*

On September 22, 2021, the parties appeared for an evidentiary hearing on Zaki's RFO. At the hearing's outset, the trial court provided a tentative ruling on Luci's RFO for dismissal. For Zaki's request No. 1, the court observed, "the parties contentions make clear they have fundamentally different interpretations of that first paragraph of the judgment regarding the Virginia property, . . . specifically paragraph 1(A). Zaki claims he wants to 'enforce this provision,' but that argument[ is]

8

based on his interpretation of that provision. Luc[i] countered that the provision does not mean what Zaki says it means, and that his request is barred by res judicata, but both of these contentions misconstrue the actual dispute. While the judgment is res judicata as to what is in the judgment, here the parties dispute what the provision in the judgment means. The court cannot just enforce a provision that is reasonably susceptible to ambiguity as to the Chase loan on the property . . . ."[3] Thus, the court denied Luci's request to dismiss request No. 1 and stated the matter would proceed to an evidentiary hearing on the issue.

As to request No. 2, the court found it was "nonsensical as written in the RFO. To the extent Zaki is asking the court to make an order that the sums due for the elevator, pest control, maintenance, and utilities for the Virginia property total $300,000, this request would be asking the court to alter the judgment to add in a specific number for the amount of these obligations. . . . If the parties want to meet and confer and agree upon the total of any such obligations, or if they are not able to reach an agreement, and there's further litigation about that so be it, but this is an RFO to 'enforce the judgment.' It's not the proper vehicle to request that the court start adding in provisions to the judgment." The court also could not construe request No. 2 as a request to enforce the judgment because the Sunset property had not yet been sold, so there was no pot of money yet in escrow from which payment could be made under the MSA's terms. The court clarified that when the Sunset property was sold, the

---

[3] During the evidentiary hearing, the court reiterated that it did not find paragraph 1A was ambiguous, but instead that it was susceptible to ambiguity.

9

parties could then (if necessary) litigate the amounts that come out of the sale proceeds for "those expenses," i.e., elevator, pest control, maintenance, utilities, et cetera for the Virginia property. The court adopted its tentative to dismiss request No. 2 as its final ruling.

2.  *Evidentiary Hearing on Request No. 1 in Zaki's RFO*

The court held an evidentiary hearing as to Zaki's first request on September 23 and 24, 2021, and February 2, 2022.

a.  <u>Zaki's Testimony</u>

Zaki testified that at the time he entered into the MSA, there was a mortgage loan on the Virginia property. Both the property and the loan were in Luci's name. Before he signed the MSA, Zaki spoke with DeCarolis about the terms "encumbrances" and "obligations," and about the Chase loan and maintenance on the Virginia property. DeCarolis told him an obligation was "strictly related to [Luci] and encumbrance [was] [an] obligation or indebtedness in [a] certain name, like Zaki Mansour or Lu[ci] Lozano." During negotiations, DeCarolis asked Zaki if he had any debts on the Sunset or Virginia properties; Zaki responded, "no," and DeCarolis assured Zaki that he did not "have to worry about it." Zaki testified that DeCarolis told him, "Lu[ci] will be responsible for all obligation[s] in her name." Further, when Zaki asked DeCarolis about the Chase loan on the Virginia property, DeCarolis told him that it had been signed by Luci and she was responsible for it. Zaki and DeCarolis did not discuss Zaki assuming or refinancing the Chase loan.

DeCarolis examined Zaki under Code of Civil Procedure section 776 during the evidentiary hearing. Zaki believed that under the settlement, he would be awarded the Virginia property without having to take over the loan. According to Zaki, Luci

10

came to the marriage with "nothing," and would be responsible for the loan. DeCarolis asked Zaki about prior settlement discussions in which Zaki had agreed to indemnify Luci and hold her harmless with respect to the loan. Zaki responded that that agreement was never finalized. Moreover, between the date of the prior settlement offer and the MSA, Zaki's settlement position changed because he discovered Luci had received $350,000 in income that she hid from him. Zaki acknowledged that after the parties entered into the MSA, he paid the mortgage on the Virginia property, but stated that he did so "to mitigate [his] damages."

DeCarolis submitted portions of Zaki's deposition testimony for the court's consideration. These portions are not included in the record. However, based on discussions on the record, as well as the court's findings at the conclusion of the evidentiary hearing, the excerpts appear to have related to Zaki's credibility, including that he spent two years in prison upon being convicted of a crime involving dishonesty, and that in the last decade, Zaki had been involved in 386 lawsuits, demonstrating his litigious nature. Zaki also admitted that when he and DeCarolis were in the bathroom during a break in the proceedings, Zaki said he wished he had a gun so he could shoot DeCarolis.

b.    Luci's Testimony

Luci testified that during settlement discussions she never took the position that she would be responsible for all liabilities in her name, nor did she agree that the second sentence in

11

paragraph 1A was intended to include the Chase loan.[4] Zaki's attorney asked, "the deal memorandum doesn't say that the money to pay the obligation in your name on [the] Virginia [property] will come from Zaki's share of the Sunset [property] sale proceeds; correct?" Luci responded, "It's not directly written that way, but it was both of our intentions that whatever property [we] each got we are responsible for our individual debts. It was never my intention to give him [the] Virginia [property] and pay for his loan and all his expenses." Zaki's counsel then impeached Luci with her deposition testimony where she was asked, "Isn't it true that [the MSA] doesn't say [payment is] coming from Zaki's share of Sunset?" and responded, "No, to me it doesn't say that." Luci further testified there was no need to add language to paragraph 1B about her obligations on the Mariposa property because she was awarded that property and the obligations were already in her name.

### c.    DeCarolis's Testimony

DeCarolis testified that he has been practicing law for 42 years, had been a family law specialist since 1984, and was a past chair of the Los Angeles County Bar Association Family Law Section executive committee. During the April 17, 2019 mandatory settlement conference, Zaki and DeCarolis worked together in drafting the settlement agreement. Zaki sat next to DeCarolis while DeCarolis typed the settlement agreement, and Zaki could read the computer screen. He and Zaki discussed the

_____

[4] However, Luci also testified that she believed there was a discussion during the settlement negotiations that the phrase "other . . . outstanding obligation . . . in [her] name" would include the Chase loan.

terms as DeCarolis typed and, sometimes, Zaki stopped DeCarolis. DeCarolis also caucused with Luci. During the process, DeCarolis printed the settlement document a couple of times, and after a couple of hours, the parties signed the agreement. Neither Zaki nor DeCarolis raised the Chase loan specifically during the negotiations. During Judge Silverman's colloquy with the parties before he signed the settlement stipulation, Zaki volunteered that he participated in drafting the document. Sometime between April 17, 2019 and January 7, 2020, DeCarolis learned that the Chase loan was not assumable. The first DeCarolis heard that Zaki would not pay the Chase loan was through Zaki's counsel's February 19, 2020 letter.

On February 2, 2022, the parties appeared for the continued evidentiary hearing.[5] DeCarolis continued his testimony, and the parties made their closing remarks. The court took the matter under submission.

## D. Sale of the Sunset Property

On October 1, 2021, the parties executed a purchase agreement to sell the Sunset property to a third party for $5.8 million. Zaki thereafter refused to vacate the property. The buyer requested a rent credit of $2,000 for each day Zaki remained in the property from December 1, 2021 onwards. On December 7, 2021, the trial court reduced the purchase price for

---

[5] On December 22, 2021, Zaki's limited scope counsel sought to be relieved. Zaki hired new counsel for the February 2, 2022 evidentiary hearing. Approximately seven different firms represented Zaki throughout the dissolution and post-judgment proceedings.

13

such rent.  Los Angeles County Sheriff's deputies removed Zaki from the property on December 15, 2021.

**E.    The Court's Ruling on Zaki's RFO**

On February 4, 2022, the court issued a minute order concerning Zaki's October 22, 2020 RFO.  It found Zaki's testimony that DeCarolis told Zaki that he did not need to worry about the loan on the Virginia property because it was an encumbrance in Luci's name was "nonsensical, confusing, and utterly not credible."  In contrast, DeCarolis's and Luci's testimonies were logical and credible, including Luci's testimony that the second sentence of paragraph 1A was added because she was concerned Zaki would not otherwise pay those obligations.

The trial court found "no ambiguity in paragraph 1" and denied Zaki's RFO to enforce that paragraph as purportedly meaning that the community's proceeds from the sale of the Sunset property (or alternatively solely Luci's share of such proceeds) were to be used to pay the Chase loan.  Rather, the court concluded paragraph 1A provided that Zaki "receive[] the Virginia Property 'subject to encumbrances thereon,' meaning he gets the property but is also responsible for the encumbrances (loan)."  To assure payment, the court ordered, "The remaining Chase loan amount, as well as the 'outstanding obligations' on the property, are to be paid out from Zaki's share of the proceeds from the sale of the Sunset property."

On February 25, 2022, the court issued its findings and order after hearing on Zaki's October 22, 2020 RFO, which incorporated the language of its February 4, 2020 minute order. Zaki timely filed a notice of appeal.

14

# DISCUSSION

## A. Request No. 1

### 1. *Standard of Review*

We construe an MSA incorporated into a dissolution judgment under the statutory rules governing the interpretation of contracts. (*In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1012.) " 'The ultimate construction placed on the contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence.' [Citation.]" (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 948.) "Appellate courts 'do not reweigh evidence or reassess the credibility of witnesses. [Citation.]' [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) We are not bound by the trial court's reasoning and may affirm the relief ordered below if it was correct on any theory. (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192-1193.)

Here, the parties disagree as to the applicable standard of review. Zaki argues our review is de novo. He observes that the court found "no ambiguity in paragraph 1," and thus, must have interpreted the agreement based solely on its language and not any extrinsic evidence. Luci, on the other hand, argues our review should be deferential because the trial court's decision turned on the credibility of the parties' extrinsic evidence. We further discuss the applicable standard of review below in connection with our analysis of particular contractual language.

15

2.      *General Principles of Contract Interpretation*

" 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.  [Citation.]  If contractual language is clear and explicit, it governs.  [Citation.]  On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."  [Citations.]'  [Citation.]  'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.  [Citations.]'  [Citations.]"  (*People v. Shelton* (2006) 37 Cal.4th 759, 767; see also *In re Marriage of Hibbard*, *supra*, 212 Cal.App.4th at p. 1013.)

" 'Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible.  [Citations.]  If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract.  [Citations.]  Thus, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." '  [Citation.]"  (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8, quoting *Founding Members of*

16

*the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

" 'California recognizes the objective theory of contracts [citation], under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation" [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations].' [Citation.]" (*Iqbal v. Ziadeh*, *supra*, 10 Cal.App.5th at pp. 8-9.)

   3. *The MSA Unambiguously Requires Zaki to Pay the Virginia Property Loan*

The first and second sentences of paragraph 1A state, "The [Virginia property] is awarded to Zaki subject to the encumbrances thereon. Directly from the sales escrow on Sunset, below, the Los AngelesCity [*sic*] rent control fees and penalties on this property shall be paid as well as all other outstanding obligations on the building in Luci's name such as the elevator, pest control, maintnenance [*sic*], utiltities [*sic*], etc."

Zaki argues he is not responsible for the Chase loan because the loan was in Luci's name and, under the second sentence of paragraph 1A, all obligations under Luci's name were to be paid from the Sunset property sales escrow. To resolve his contention, we begin by considering whether the loan falls within the term "encumbrance" in the first sentence or "obligation" in the second sentence. If it is the first, then the loan is Zaki's responsibility. If it is the second, then the loan is to be paid "[d]irectly from the sales escrow" from the Sunset property.

At first glance, the Chase mortgage arguably could fall within the definitions of both "obligation" and "encumbrance." An obligation is "an amount of money owed under a commitment

17

to pay a particular sum." (Merriam-Webster Unabridged Dictionary <https://unabridged.merriam-webster.com/unabridged/obligation> [as of Mar. 20, 2024].) An encumbrance is "a burden or charge upon property[;] a claim or lien upon an estate that may diminish its value specifically[;] any interest or right in land existing to the diminution of the value of the fee but not preventing the passing of the fee by conveyance." (Merriam-Webster Unabridged Dictionary https://unabridged.merriam-webster.com/unabridged/encumbrance [as of Mar. 20, 2024]; see also Oxford English Dictionary < https://www.oed.com/search/advanced/Meanings?textTermText0= encumbrance&textTermOpt0=WordPhrase> [as of Mar. 20, 2024] [encumbrance, as used in legal parlance, means, "A burden on property: 'A claim, lien, liability attached to property; as a mortgage, a registered judgment, etc.' "].) Given these definitions, the term encumbrance more specifically describes the Chase mortgage, which supports a construction of the first sentence of paragraph 1A that the mortgage loan properly falls within that term and not the later contractual language concerning obligations. (Rest.2d Contracts, § 203, subd. (c) ["specific terms and exact terms are given greater weight than general language"].)

We further reject Zaki's construction because it renders the phrase "subject to the encumbrances thereon" superfluous. If there were any encumbrances on the Virginia property that were not solely in Luci's name, then the phrase "subject to the encumbrances thereon" would still have meaning even if the Chase loan fell within the second sentence category of "all other outstanding obligations." However, if all the encumbrances on

the Virginia property were in Luci's name only, Zaki's interpretation would render the phrase "subject to the encumbrances thereon" mere surplusage because under his construction everything that could possibly be an encumbrance would be an obligation.

The uncontradicted extrinsic evidence offered in relation to Zaki's RFO established that at the time the parties entered into the MSA, the Virginia property and Chase loan were in Luci's name only and there were no debts in Zaki's name on the Virginia property. Indeed, the Chase loan was the *only* encumbrance on that property identified in the evidence and testimony. We interpret contracts to give effect to every part and avoid constructions that render terms surplusage. (See Civ. Code, § 1641 [providing contracts should be interpreted "so as to give effect to every part"]; Code Civ. Proc., § 1858 ["In the construction of a[n] . . . instrument, the office of the [j]udge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all"]; *Rice v. Downs* (2016) 248 Cal.App.4th 175, 186 ["An interpretation that leaves part of a contract as surplusage is to be avoided"].) Thus, to give effect to every part of the MSA, the Chase loan must belong to the first sentence category of encumbrances on the Virginia property, meaning that it is Zaki's sole responsibility.

Moreover, "[u]nder the principle of ejusdem generis, where specific words follow general words in a contract, the general words are construed to embrace only things similar in nature to those enumerated by the specific words. (See *Nygård v. Uusi-*

19

*Kerttula* (2008) 159 C[al].A[pp].4th 1027, 1046 . . . [phrase 'any information, knowledge or data of the [c]ompany' was construed in light of kinds of protected information enumerated in following sentence].)" (1 Witkin, Summary of Cal. Law (11th ed. 2023) Contracts, § 764.) Here, the second sentence limits what falls into the category of "all other outstanding obligations on the building in Luci's name" by describing them to be things "such as the elevator, pest control, maintnenance [*sic*], utiltities [*sic*], etc." In other words, the obligations to be paid from the Sunset property sales escrow are all of a similar character—namely, regular maintenance, utilities, and other operating costs related to an apartment building. A mortgage of over $1.5 million is of a significantly different nature. The mortgage is nowhere mentioned in the example list of obligations, and given the size of the mortgage as well as the possible impact to the Virginia property of it going unpaid, it is illogical for the parties not to have called it out (as they did with much more minor matters such as "pest control" expenses) if the mortgage was meant to be included in that category.

Thus, pursuant to our de novo review, and having determined the extrinsic evidence adduced shows the MSA is not reasonably susceptible to Zaki's interpretation, we conclude the MSA's language makes Zaki alone financially responsible for the mortgage loan on the Virginia property.

The MSA did not state that Zaki's share of the proceeds from the sale of the Sunset property would be used to pay the Chase loan, although that was the source of funds the court ultimately ordered used to satisfy Zaki's obligation. But a family court has broad discretion to fashion orders necessary to enforce a judgment. (See Fam. Code, § 290 ["A judgment or order made

20

or entered pursuant to this code may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary"].) The court was presented with an RFO to enforce the judgment. Given the disputes over payment and a myriad of other issues between the parties, and concern over whether Zaki would make good on any order to pay off the mortgage to take Luci's name off the encumbrance, it was within the court's discretion to resolve that RFO by ordering that the Chase loan be paid from Zaki's share of the Sunset property sale proceeds to ensure Zaki fulfilled his responsibility under the judgment.

4. *The MSA Provided the "Outstanding Obligations" Were Zaki's Responsibility*

Unlike the mortgage loan issue, we do not resolve Zaki's argument that paragraph 1A of the MSA requires Luci to share in the payment of rent control fees, penalties, utilities, and other obligations on the Virginia property on the basis of unambiguous contract language. Luci's construction of the MSA as making Zaki solely responsible for these obligations is straightforward. The MSA says that "[a]ll such obligations shall be transferred to Zaki's name immediately upon Luci's transfer [of the Virginia property] to him," awards him the property, and states that the court, in signing the MSA as a stipulated order, "mak[es] these orders effective immediately as temporary orders pending the filing of the judgment." This suggests that Zaki became financially responsible for the Virginia property obligations as of the date of the MSA.

On the other hand, the construction offered by Zaki's counsel also has some plausibility. Nothing in paragraph 2

concerning the application of the Sunset property sales proceeds addresses payment of the Virginia property obligations.  Instead, paragraph 2C states that after certain other specifically named expenses are paid, "[t]he remaining proceeds . . . shall be awarded one-half to each party."  When read along with paragraph 1A, paragraph 2C could potentially be read to suggest the Virginia property operating obligations were to be paid one-half by each party.

Substantial extrinsic evidence supports the interpretation of this language as meaning that Zaki alone is responsible for payment of these obligations and requires affirmance of the trial court's construction.  (*In re Marriage of Minkin*, *supra*, 11 Cal.App.5th at p. 948 [" 'When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence' "].)  While Zaki's lawyers argue both parties were 50 percent responsible each for paying the "obligations" referenced in the second sentence of paragraph 1A, Zaki himself testified differently.  He claimed Luci was 100 percent responsible for paying these obligations—a position that has zero textual support, and understandably led the court to find his testimony not credible.

Luci, on the other hand, testified that during settlement negotiations she did not assume responsibility for all liabilities in her name.  She further clarified "it was both of our intentions that whatever property [we] each got we are responsible for our individual debts.  It was never my intention to give him Virginia and pay for . . . all his expenses."  Further, DeCarolis's testimony supports an interpretation that the use of the word "escrow" was meant to indicate simply that the obligations were to be paid

from the Sunset property sales proceeds before they were distributed to the parties. He testified that the Virginia property was "the one that Zaki had control over," and Luci was concerned "vendors and taxes and so forth that were in [her] name" would not be paid. Thus, the second sentence was added to clarify that the obligations would be paid directly by Zaki from the Sunset property sales escrow. He stated the obligations were not "just transferred into Zaki's name" because the vendors would not just leave Luci alone when there were amounts due that had previously been under her name.

## B.      Request No. 2

Zaki argues the court should not have dismissed his request No. 2 for an order requiring the "sums due to elevator, pest control, maintenance, [and] utilities" without taking evidence on the issue. This requested order is moot as we find the trial court correctly held that Luci was not responsible for any portion of these expenses on the Virginia property. Accordingly, the court did not err in refusing to further consider a request for an order that Luci contribute a specific amount to defray those expenses.

## DISPOSITION

The judgment is affirmed.  Luci is awarded her costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.